

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00062-CV

———————————————

IN THE INTEREST OF N.M. AND H.M., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-728321-23

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant T.M. (Father) and Appellant R.W. (Mother) appeal the termination of their parental rights to their twin daughters N.M. (Neely)[2] and H.M. (Holly) following a two-day bench trial.[3] The trial court terminated Father's parental rights based on clear and convincing evidence of four predicate grounds—endangering environment, endangering conduct, constructive abandonment, and failure to comply with his court-ordered service plan—and the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (b)(2). The trial court terminated Mother's parental rights based on clear and convincing evidence of four predicate grounds—endangering environment, endangering conduct, prior parental-rights termination on endangerment grounds, and failure to comply with her court-ordered service plan—and the best-interest ground. *See id.* § 161.001(b)(1)(D), (E), (M), (O), (b)(2). In a single issue, Father

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). We use aliases to refer to all four children who are mentioned in this opinion.

[3]The trial was started on November 16, 2023, and continued on January 8, 2024. The final judgment was rendered on February 6, 2024, which was within ninety days of the commencement of the trial on the merits. *See* Tex. Fam. Code Ann. § 263.4011(a).

challenges the sufficiency of the evidence to support the best-interest ground. Mother's court-appointed attorney filed an *Anders*[4] brief, stating that he did not find any legally nonfrivolous ground constituting error. Because sufficient evidence supports the trial court's best-interest finding that Father challenges and because Mother's appeal is frivolous, we affirm the trial court's judgment terminating Father's and Mother's parental rights to Neely and Holly.

## II. Background[5]

Kayla Middleton, an investigator with Child Protective Investigations, testified that she had investigated a case in October 2021 involving two of Mother's children—K.W. (Kate) and K.W. (Kerry)—who are slightly older than Neely and Holly.[6] Middleton testified that there was an allegation of physical neglect.

When Middleton went to talk to Mother at her home, "[s]he kind of had a flat demeanor," went around picking up the house, and did not think that the situation was serious. Mother explained the situation matter of factly: Kerry would not wake up, they called EMS, and he went to the hospital. The hospital records noted that

---

[4]*Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967).

[5]At the outset we note that Mother had birthed four children at the time of the termination trial, and none were living with her. One of the termination grounds presented at trial was that Mother had previously had her parental rights to two other children terminated based on endangerment grounds. The termination trial opened with testimony regarding the allegations and events that led to the prior termination.

[6]Kate was born in April 2020, Kerry was born in September 2021, and the twins were born in December 2022.

Kerry was a seven-week-old baby who had been born full term and who had presented to the emergency room on October 14, 2021, "due to altered mental status and decrease[d] responsiveness." He required "bagging en route" to the hospital in the ambulance and was intubated in the ER. The hospital records noted that Mother had a history of bipolar disorder, schizophrenia, depression, and anxiety but did not take medication due to the side effects.

> Middleton testified that her concerns were that Kerry
>
> was underweight from when he was born. There was missing skin on his scrotum [because he had sat in feces that had become caked on]. . . . [H]is skin was clinging to his bones. He was on a ventilator. He was intubated. There [were] concerns with the house. . . . The house was in disarray, and the sleeping arrangements were a concern for a newborn.

Middleton explained that Kerry weighed four pounds, having lost twenty-one percent of his birth weight. Kerry was diagnosed with failure to thrive. When Middleton questioned Mother about how much she was feeding Kerry, she said that typically she would breastfeed him for "a couple of minutes" and then make one bottle for the entire day; she said that Kerry would eat four ounces out of the bottle for the entire day.[7] Middleton asked to see the bottle and learned that there was only one. At first, Mother could not find it but then found it under the couch; it had curdled milk at the top and water at the bottom. With regard to the condition of the

---

[7]Another time during her testimony, Middleton stated that Father had said that Kerry had consumed one ounce every two or three hours but that Mother had reported that Kerry had consumed eight ounces every three hours.

4

home, Middleton testified that there was medication that was easily accessible on the counter, food and trash on the floor, and dirty diapers.

The hospital records noted that Mother had claimed that Kerry had been healthy until "last night" (October 13, 2021) when he had stopped breathing, would not respond to his name, could not hold his head up, and only took "one suck" of his bottle. Mother said that Kerry had a prior incident when he was two weeks old when EMS was called because he had breathing issues.

According to the hospital records, Father, who is not Kate or Kerry's father, stated that Kerry had been well but that three days prior to his hospital admission, he had started spitting out his formula and had started having decreased oral intake. Father told Middleton that he had never noticed any issues when he had changed Kerry's diapers.

The hospital records showed that "[s]uspicion for an inborn error of metabolism is very low[ and] that malnutrition explain[ed Kerry's] elevated creatinine, liver[-]function tests, electrolyte abnormalities, and his entire picture." Middleton agreed that the only medical explanation for Kerry's condition was malnutrition.

After Kerry and his older sister Kate were removed from Mother and Father, Kate underwent a drug test and tested positive for cocaine.

While Kate and Kerry were in the Department's care, Mother gave birth to Neely and Holly. Takoya Brooks, an investigator with the Department of Family and Protective Services, testified that she had received an intake on Neely and Holly on

December 21, 2022. Specifically, the concern was for neglectful supervision due to "concerns of intellectual disability"[8] exhibited by Mother that impaired her ability to care for the children.

Brooks contacted Mother at the hospital where the twins had recently been born,[9] and Mother confirmed that she has an intellectual disability. Brooks said that Mother had difficulty answering some questions or would not answer the questions that were asked and instead told Brooks "something totally different." Brooks asked Mother about her ongoing CPS case involving Kate and Kerry, and Mother confirmed that the Department had removed the children but said that the Department had lied in order to remove them.

Mother said that she and the twins' Father were residing at the Salvation Army at that time. They had some necessities for the children but not enough for both. For instance, they had only one car seat and no cribs or beds for them. Brooks had concerns about having the twins discharged[10] to Mother and Father because Mother's other children were already in the Department's care due to Kerry's malnutrition and because Mother and Father did not have the funds to provide for the twins' needs or for stable housing. During a staffing meeting with Our Community Our Kids

---

[8]Mother had a full IQ score of 57, "which fell at the 0.1st percentile in the Extremely Low range."

[9]The twins were in the NICU because they were "so small."

[10]The twins were initially set to be discharged from the hospital on December 29, 2022, but that date was pushed back.

(OCOK),[11] Brooks learned that Mother had undergone a psychological assessment that reflected intellectual concerns, including that she would not be able to care for more than one child without twenty-four-hour supervision.

Brooks summarized the Department's concerns regarding ongoing risks if the children were not removed from Father's and Mother's care as follows: Father and Mother could not financially support two newborns, Mother had an intellectual disability that impaired her judgment in caring for the children, and Mother's other children had been removed due to "some severe concerns for failure to thrive." As a result, upon their release from the hospital, the twins were placed in foster care.

Tayland Glover, an OCOK permanency specialist, testified that she had received the case in January 2023. Some of the initial concerns included Mother's mental capacity and her stability. The same concerns existed as to Father, as well as his drug use.[12] It was also concerning that Father had been arrested for assaulting Mother while she was pregnant and that he had noted during the family strengths and needs assessment that he did not have any parenting skills.

---

[11]As this court has previously explained, "OCOK is a private provider of community-based care that contracts with the Department to provide 'foster[-]care case management, kinship, and family reunification services' in parts of the state, including Tarrant County." *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.).

[12]Father admitted to Glover that he used marijuana recreationally due to glaucoma but never provided any documentation to substantiate his diagnosis or a medical card for marijuana. Additionally, Father never submitted to requested drug tests, which were presumed positive.

7

Glover developed service plans for Mother and Father. Mother made minimal progress on her plan; Father did not make any progress on his as he did not begin his services. Mother did not maintain housing during the case. She had lived at the Salvation Army; at an MHMR facility; in New Orleans with Father's mother, who had a history of drug use (crack was her drug of choice); at an unknown place, possibly a shelter; and in Corsicana, where she was living at the time of the termination trial. Mother and Father also had no history of stability with employment. Glover said that they had not demonstrated an ability to provide the basic necessities for the children through employment; Mother had worked somewhere for about a week, and Father had said that he was going to jobs but never provided any paycheck stubs.

The parents initially were allowed two-hour weekly in-person visits. Father attended only one visit before he moved to New Orleans[13] around April 2023, and Mother, who had complied with visitation, moved to New Orleans around June 2023. During the in-person visits, Mother had trouble getting the measurements correct for the formula, and she overreacted when Neely spit up. After the parents moved to New Orleans, only Mother continued to attend weekly FaceTime visits with the children.[14] When asked if there was any reason why the twins could not be placed

_____

[13]Father is originally from New Orleans and considered that his home.

[14]However, the permanency report, which was filed in the trial court on October 20, 2023, states that "[a]s of October 5, 2023, [Father] has had . . . few in[-]person interactions with the children due to hi[s] being detained and lack of

with Father in New Orleans, Glover said that Father had not mitigated any of the safety concerns and could not meet their needs.

Glover explained that she had seen the effects of the neglect due to Mother's inability to parent play out in the prior case involving Kate and Kerry such that Kerry had numerous medical diagnoses, lots of medical appointments, and a nurse who works with him forty hours per week. Neely has craniofacial issues that require her to wear a helmet, has an umbilical cord hernia, was diagnosed with torticollis, and had seborrheic dermatitis; she was receiving services from Early Childhood Intervention (ECI) at the time of the trial. Holly is "a little more advanced" than Neely but was also receiving services from ECI at the time of the trial and was being monitored due to possibly having a sickle-cell trait.[15]

Glover opined that the children should not be returned to Father and Mother because

> of the mental[-]health capacity of both of the parents. It's concerning that [Mother] has been in this case this long and still doesn't understand all the kids' needs. And even most recently, [she] just learned why [Neely] even requires her helmet.
>
> Just lack of knowledge of how to properly parent them. Neither parent has shown that [he or she] can meet the needs of the kids by

---

involvement in the case. [Father] has since begun participating in [Z]oom visitations with the children." [Italics removed.]

[15]Per the Court-Appointed Special Advocate's report, which was filed in the trial court on November 9, 2023, both Neely and Holly were receiving physical therapy weekly.

providing anything for them.  I think [Mother] maybe -- ha[s] provided
. . . a few items for the children but nothing consistently.

The children have a lot of medical needs, and they need to be
with a caregiver [who] knows how to meet their needs.

Glover described the foster family—in which all four of Mother's children were living—as a big supportive family:

Foster mom is a stay-at-home mom.  Foster dad works from home
often, so he's able to give her a helping hand.  They have the
grandmother in the home.  They have a nurse there [who focuses] on
[Kerry's] needs but also helps out with the family.  They have an adult
son in the home[ and] another daughter in the home.  They're all very
bonded.  Everyone helps everyone.

Glover said that the foster family maintains all of Mother's children's "many, many therapy appointments and many medical appointments."  Glover opined that the foster parents would be able to meet the children's physical, emotional, and financial needs now and in the future.

Glover asked the trial court to terminate Father's and Mother's parental rights to Neely and Holly and opined that termination was in the children's best interest. The foster home where the twins were residing is adoption motivated and planned to adopt all four children.  Glover said that the services available to the foster parents to help the children going forward would include the same services that they were being provided, as well as assistance with Medicaid and subsidies.

Mother testified that she believed that she had completed the services on her plan.  She said that she was unemployed and was living with a friend in Corsicana at

the time of the termination trial. Mother was questioned about why Kate and Kerry had come into the Department's care, and she could only say that it was because Kerry had stopped breathing. Despite having heard testimony that he was malnourished, Mother did not relay that information or seem to grasp the connection.

After hearing the testimony and reviewing the evidence, the trial court found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the children's best interest. The trial court terminated Father's parental rights based on clear and convincing evidence of four predicate grounds—endangering environment, endangering conduct, constructive abandonment, and failure to comply with his court-ordered service plan—and the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (b)(2). The trial court also terminated Mother's parental rights based on clear and convincing evidence of four predicate grounds—endangering environment, endangering conduct, prior parental-rights termination, and failure to comply with her court-ordered service plan—and the best-interest ground. *See id.* § 161.001(b)(1)(D), (E), (M), (O), (b)(2). Father and Mother then perfected these appeals.

### III.  Father's Appeal

In a single issue, Father argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding. Father's entire "best-interest" analysis runs barely one page, and we set forth his analysis in its entirety without alteration:

11

The evidence is legally and factually insufficient to support the findings that termination of T.M.'s parental rights is in the best interest of the children.

Section 161.001 of the Texas Family Code allows a court to terminate parental rights if the two parts of the statute are satisfied: First, the parent must have relinquished or engaged in one of the acts set forth in the statute. TEX. FAM. CODE ANN. § 161.001(1). Second, the termination of the parent-child relationship must be in the child's best interest. TEX. FAM. CODE ANN. § 161.001(2).

Furthermore, Section 161.003 (e) of the Texas Family Code also states that termination of the parent-child relationship must be in the child's best interest. A strong presumption exists that the best interests of the child is served by maintaining the parent-child relationship. *In re G.M.*, 596 SW2d 846, 847 (Texas 1980).

Here, although T.M. did not appear for the trial, Caseworker Glover indicated she did not have any safety concerns regarding the condition of his mother's home. Since T.M. lived with his mother and the house was appropriate, T.M. and his mother could provide the necessities for the children if they were returned to his care.

Additionally, after considering all the evidence in light most favorable to the TDFPS, no reasonable trier of fact could form a firm belief or conviction that termination of T.M.'s parental rights is in the best interest of the children.

Nowhere in Father's brief does he cite to *Holley v. Adams*[16] or set forth the best-interest factors, much less discuss them. This does not meet the standards set forth in the Standards for Appellate Conduct. *See* Standards for Appellate Conduct, *Lawyers' Duties to the Court* ¶ 4, Texas Rules of Court (State) 324–25 (West 2023) ("Counsel will advise the Court of controlling legal authorities, including those adverse to their position, and should not cite authority that has been reversed, overruled, or restricted

---

[16]544 S.W.2d 367, 371–72 (Tex. 1976).

without informing the court of those limitations.") (*available at* http://www.txcourts.gov/media/1437423/standards-for-appellate-conduct.pdf).[17] Because the scenario presented here is not a close call, we will not request rebriefing or further delay the children's permanency but will proceed to conduct the best-interest analysis that is mandated by law.

### A. Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences,

---

[17]Parents who have had their parental rights terminated deserve better representation than what is exemplified in the brief that Father's court-appointed counsel filed in this case, and this court will not continue to accept such inadequate briefing.

but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)    the [child's] desires . . . ;

(B)    the [child's] emotional and physical needs[,] . . . now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)    the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the [parent's] acts or omissions.

15

*Holley*, 544 S.W.2d at 371–72 (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis

As to the first *Holley* factor, the twins were approximately eleven months old at the start of the termination trial. They were therefore too young to express their desires regarding whether they wanted to live with Father. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (holding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires"). Because there was no evidence of the twins' desires, this factor is neutral. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) ("[T]he first *Holley* factor is neutral because no evidence of the children's desires was presented.").

Regarding the second and third factors,[18] as well as the fourth and eighth factors, the record demonstrates that the twins had ongoing medical needs and that the initial referral in the record notes that two of Mother's prior children were removed from the home due to failing to provide ongoing medical care for special needs of the children. Although Father was not the biological father for Mother's two older children, he was one of their caretakers and did not make sure that Kerry received proper nutrition and hygiene, as he was malnourished and exhibited missing skin on his scrotum due to the failure to regularly have his diapers changed. Father further did not demonstrate that he could provide for the twins' physical needs. He was a danger to the twins due to his drug use; the domestic violence he perpetrated against Mother while she was pregnant; and his failure to work, much less complete, any of his services. Moreover, he did not regularly visit with the twins. These four factors weigh in favor of the trial court's best-interest finding.

As to the sixth and seventh factors—the plans for the twins and the stability of the home—Father's plan for the twins was for them to live with him and his mother

---

[18]With regard to the second and third factors that focus on the children's emotional and physical needs and danger to the children now and in the future, this court has previously noted, "Children need long-term safety and stability." *In re V.S.*, No. 02-22-00063-CV, 2022 WL 2252775, at *4 (Tex. App.—Fort Worth June 23, 2022, pet. denied) (mem. op.) (first citing Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); then citing *In re M.A.J.*, 612 S.W.3d 398, 411 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g); and then citing *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied)).

in New Orleans. Although Father may have resided with his mother for a substantial portion of the case (though the record does not contain much information about this), it was not a safe home for the children because his mother had been a crack addict. The foster family who wished to adopt the children and with whom the children resided did not have a drug concern and had demonstrated stability. These two factors weigh in favor of the trial court's best-interest finding.

Regarding the fifth factor, which pertains to the programs available to assist these individuals to promote the children's best interest, the record demonstrates that Father was offered services to obtain the return of his children, but he did not work his services. This factor weighs in favor of the trial court's best-interest finding.

As to the final factor, Father excused his drug use on glaucoma but never provided any documentation to substantiate his diagnosis or a medical card for marijuana. This factor weighs in favor of the trial court's best-interest finding.

Based on all the evidence and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights to Neely and Holly was in their best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *see also In re A.F.*, No. 10-19-00335-CV, 2020 WL 1313450, at *18–19 (Tex. App.—Waco Mar. 19, 2020, no pet.) (mem. op.)

18

(holding evidence legally and factually sufficient to support best-interest finding and concluding that termination "was not improper just because some of the evidence indicated that [mother was] economically disadvantaged" when evidence revealed that there was domestic violence in the home and that mother was using illegal drugs). Accordingly, we overrule Father's sole issue challenging the sufficiency of the evidence to support the trial court's best-interest finding.

## IV. Mother's Appeal

Mother's court-appointed appellate attorney filed a "Brief in Support of Motion for Leave to Withdraw as Appellate Counsel in Accordance with *Anders v. California*,"[19] averring that after diligently reviewing the record, he believes that the appeal is frivolous. *See* 386 U.S. at 744–45, 87 S. Ct. at 1400; *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (reasoning that *Anders* procedures apply in noncriminal appeals when appointment of counsel is mandated by statute). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Mother did not file a response. The Department filed a letter stating that because Mother had not pointed to any arguable grounds for relief, "the Department will not reply to the *Anders* brief."

---

[19]Mother's attorney, however, states in the brief that he has not filed a motion for leave to withdraw.

19

As the reviewing appellate court, we must independently examine the record to decide whether an attorney is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.). Having carefully reviewed the record and the *Anders* brief, we agree that Mother's appeal is frivolous. We find nothing in the record that might arguably support Mother's appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).

## V.  Conclusion

Having overruled Father's sole issue and having held that nothing in the record might arguably support Mother's appeal, we affirm the trial court's judgment terminating Father's and Mother's parental rights to Neely and Holly.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  June 13, 2024

20